STATE OF MICHIGAN

IN THE 36TH DISTRICT COURT FOR THE CITY OF DETROIT

PEOPLE OF THE STATE OF MICHIGAN,

vs.

RECORDER'S NO.88-11275

36TH DIST. NO. 88-66787

DWIGHT HASSAD RASHAD and
SHEILA BUFKIN,

Defendants.

_____/

PROCEEDINGS HAD and TESTIMONY TAKEN upon

the PRELIMINARY EXAMINATION in the above-entitled cause, before

the HONORABLE RUFUS GRIFFIN, JR., Judge of the 36th District

Court, Detroit, Wayne County, Michigan, on Monday, September

19, 1988, at or about the hour of 3:18 o'clock p.m.

APPEARANCES:

> ROBERT HEALY
> Assistant Prosecuting Attorney
>
> On behalf of the People.
>
> MILTON HENRY
> Attorney-at-Law
>
> On behalf of the Defendants,
> Dwight Hassad Rashad and
> Sheila Bufkin.



RECEIVED

OCT 1 8 1988

THE RECORDER'S COURT
ASSIGNMENT DIVISION

Willie S. Cockrell, Jr., R0290
Official Court Reporter

PENGAD/INDY · MUNCIE, IN · 47302   SF-MI-25

I N D E X

WITNESSES                                                        PAGE


ARTHUR MC NAMARA

    Direct Examination by Mr. Healy                          4
    Cross-Examination by Mr. Henry                          7
    Redirect Examination by Mr. Healy                    35,39
    Recross-Examination by Mr. Henry                     38,40

STEVE SHANNON

    Direct Examination by Mr. Healy                        11
    Examination by the Court                            13,16
    Direct Examination (Continued) by Mr. Healy            16
    Cross-Examination by Mr. Henry                         18

STEVE SHANNON

    Direct Examination by Mr. Healy                        20
    Examination by the Court                               29
    Redirect Examination by Mr. Healy                      42
    Cross-Examination by Mr. Henry                         43

1        Detroit, Michigan

2        Monday, September 19, 1988

3        3:18 o'clock p.m.

4         -  -  -

5     THE CLERK:  Case No. 88-66787, People of

6 the State of Michigan versus defendant number one, Dwight

7 Rashad.  He's charged with Possession With Intent to Deliver

8 Cocaine.  Defendant number two, Sheila Bufkin, she's charged

9 with Possession With Intent to Deliver Cocaine.

10     MR. HENRY:  Milton Henry for the defendants,

11 your Honor.

12     MR. HEALY:  Robert Healy for the People.

13 Do I understand we have one lawyer for both defendants?

14     MR. HENRY:  That is correct.

15     MR. HEALY:  Is that proper?

16     MR. HENRY:  Under the circumstances of

17 our defense I would say at this point it is, yes.

18     THE COURT:  Let's just make the record

19 so that whatever is proper or improper the record will

20 reflect that at least.

21     Mr. Henry, is there any possibility there

22 will be some kind of conflict in their testimony that will

23 preclude you representing both of them at this time?

24     MR. HENRY:  Not at this examination.

25 And we discussed that previously.  Even at the arraignmen'

1    the question was raised.

2                    THE COURT:  All right.  If Mr. Rashad

3    and Ms. Bufkin have no problem I certainly have no problem.

4                    MR. HENRY:  If there are more than one

5    witness, I certainly move, your Honor, they be sequestered.

6              A R T H U R     M c N A M A R A     ,

7    was called as a witness by the People, and having been

8    first duly sworn by the Court Clerk, was examined and

9    testified as follows:

10                    DIRECT EXAMINATION

11   BY MR. HEALY:

12   Q   Your name and your rank and duty assignment as of September

13       7, 1988, that's a Wednesday?

14   A   Arthur McNamara.  I'm a sergeant for the Detroit Police

15       Department assigned to the Narcotics Division.

16   Q   Were you the crew chief in respect to the execution of

17       a search warrant at 20219 Greydale on that date?

18   A   Yes, I was.

19   Q   And can you tell the Court approximately what time of day

20       it was that the search warrant was executed?

21   A   10:00 p.m.

22   Q   After you gained entry into the house, where did you go

23       first, please?

24   A   Went into a living room like a dining room area where both

25       of these persons were brought to.

1   Q   Both of these persons being the two defendants here?

2   A   Yes, Mr. Dwight Rashad, sitting there with the white, black

3       and grey shirt.

4   Q   I don't think there is any real dispute as to which one

5       is which.

6   A   And Sheila Bufkin, sitting there in the brown dress.

7   Q   Anybody else in the house besides those two at the time

8       of execution of the warrant?

9   A   Just a baby.

10  Q   Okay.  Did you have occasion to call for the TSS dope dog?

11  A   Yes, he was with us at the time and I called him into the

12      house as soon as both of the persons were secured inside.

13  Q   Did you go with the TSS officer and the dope dog through

14      the house?

15  A   Yes.

16  Q   Did that include going into the basement?

17  A   Yes.

18  Q   Was there any activity on the part of the dog that indicated

19      to you that there was some reason to search further in

20      the basement?

21  A   The dog went directly under the steps where there is a

22      room that had a master lock on the door with a hasp and

23      he hit the bottom of the door with his nose and tried to

24      get into a crack that was there.

25  Q   Okay.  And when the dog reacted in that manner, what did

1       you do then, if anything?

2  A   I pried the hasp and the lock off the door.

3  Q   And when you pried the hasp and the lock off the door,

4       did you then look inside?

5  A   Yes, I did.

6  Q   And what did you find?

7  A   I found approximately six kilos of cocaine and approximately

8       seven ounces of heroin.

9  Q   And did you cause those to be put on lock seal folder?

10  A   Yes, I did.

11  Q   And what lock seal folder.

12  A   I need that yellow sheet.  Lock seal folder 260543.

13  Q   Where was defendant Rashad when you first saw him in the

14       house?

15  A   He was standing, like there is a rear den or T.V. room,

16       there was an addition put onto the house, he was standing

17       right in there in that area of the dining room table which

18       would have been connecting rooms.  He was right almost

19       in the doorway.

20  Q   All right.  And where was defendant Bufkin when you first

21       saw her in the house?

22  A   She was in that back addition and ordered to come forward

23       to where the dining room table was.

24  Q   Is it safe to say you were not the police officer in the

25       house?

1   A    I was not the first one, no.

2   Q    Do you have a present recollection as to who came in the

3         house before you did?

4   A    I know Officer Shannon and Officer Jerry Johnson were ahead

5         of me.

6                  MR. HEALY:  I would ask that defense enter

7         into the following stipulations, that the contents of lock

8         seal folder 260543 was analyzed by Steven Gyure of the

9         Chemical Analysis Unit and found to contain something well

10        in excess of 650 grams of cocaine.

11                MR. HENRY:  We so stipulate.

12                THE COURT:  Let the record reflect defense

13         counsel's stipulation to the chemical analysis of cocaine

14         for the purposes of examination only.

15                MR. HENRY:  That's correct.

16               CROSS-EXAMINATION

17 BY MR. HENRY:

18   Q    Officer, I also called you lieutenant.  You are not lieutenant

19         yet, but you are Sgt. McNamara?

20   A    Hopefully soon.

21   Q    Okay.  You described going down in the basement of this

22         home and finding underneath the stairway a compartment

23         area?

24   A    Yes.

25   Q    Could you describe that for us, please?

1  A   Where the stairs come from the main floor to the basement

2      there is also an area underneath the steps.  Underneath

3      the steps you would have to enter from a laundry room and

4      under the steps is partitioned off with a wall and a door

5      cut in the wood and there was a lock on the door with a

6      hasp.

7  Q   How large would that door have been?

8  A   I would say it's approximately five foot high.

9  Q   Five foot high?

10 A   Approximately.

11 Q   And would it have been built into that area and had a lock

12     on it?

13 A   Yes.

14 Q   Did you have to look hard to find it?

15 A   As soon as I opened the door I saw it and I closed the

16     door immediately.

17 Q   As soon as you opened what door?

18 A   The door I took the lock off.

19 Q   Did you ever look to find the door that was under the stairway?

20 A   No, that's in view.  You walk into the room.  You walk

21     into the laundry room, to your left would have been the

22     door, and you look and you see the lock and the door cut

23     into the wood.

24 Q   The door was cut into the wood.  What kind of door was

25     that?

1   A   I would say it's approximately a 4 x 8 sheet of wood.

2       And someone probably with a circular saw cut a five foot

3       door out of there and made a walkway and put two inches

4       on and a hasp and placed it right back into the hole that

5       they cut.

6   Q   This is an area that has been especially made out in the

7       paneling?  The paneling would then have been cut in half

8       of the normal size and then hinges put on a part of that

9       and a lock put on it?

10  A   Yeah, that's correct.

11  Q   But to get into that area you would have to bend down and

12      you couldn't just walk in?

13  A   No, to get into the area, to look at the door, I'm sorry --

14  Q   To get through the door and into the inside?

15  A   Under the stairs, yes.

16  Q   You would have to bend down?

17  A   To get inside, but with eyesight you could look straight

18      in.

19  Q   It's not the sort of place that you would just walk in

20      and out of?  It would be a secreted place?

21  A   No, you could walk in and out of it if the lock wasn't

22      there.

23  Q   You would have to bend down, wouldn't you, to get in it?

24      You said it was cut in half?

25  A   I would say it's about five foot.  You would have to bend

9

1    your head so you wouldn't bump your head.

2  Q    To get in there?

3  A    Yes.

4  Q    What kind of lock was on there?

5  A    Master lock.

6  Q    What does that mean?

7  A    That's the name "Master."

8  Q    Master lock, is that like a padlock?

9  A    Padlock.

10  Q    Big padlock?

11  A    I would say approximately an inch and a half high.

12  Q    Inch and a half high?

13  A    Approximately.  I have it on evidence.

14  Q    You are fortunate now we don't have the evidence or

15     unfortunately.  It was a padlock?

16  A    It was a Master padlock, silver with a blue ring around

17     the bottom.

18  Q    And that would have had its own key, right?

19  A    Yes.

20                    MR. HENRY:  That's all.

21                    MR. HEALY:  No further questions.  Send

22     in Shannon.

23                    S T E V E    S H A N N O N    ,

24     was called as a witness by the People, and having been

25     first duly sworn by the Court Clerk, was examined and

testified as follows:

DIRECT EXAMINATION

BY MR. HEALY:

Q    Let me have you name, your rank, your duty assignment as
of September 7, 1988.

A    Steve Shannon, Police Officer working for the City of Detroit,
currently assigned to the Narcotics Section.

Q    Were you a part of McNamara's crew in the raid of 20219
Greydale at 2:00 o'clock in the evening more or less on
that date?

A    Yes.

Q    With respect to the entry team, did you have a role?

A    Yes, I was assigned to shotgun.

Q    Okay.  And as shotgun, you are the first man through the
door?

A    That's correct.

Q    And in fact were you the first man through the door?

A    Yes.

Q    And when you went through the door, what room did you come
into first?

A    Living room.

Q    And did you see anybody as you went through the door into
the living room?

A    Looking through the living room there is an archway into
a dining area.  And in that dining area standing at a table

11

1      was an individual later identified to me as the defendant,

2      Dwight Rashad or Hassad.

3   Q    Is he in the courtroom now?

4   A    Yes.  He's seated at counsel table with the white and black

5      pants, white shirt, black pants.

6   Q    What was Rashad doing in the dining room other than standing,

7      if anything?  What did you see him do?

8   A    He had a black case in his hand which he discarged.

9   Q    In what manner did he discard it?

10   A    He gave it a flip and it slid across the table.  It remained

11      on the table.  He made an action as though he was going

12      to break from the table, but I told him to stop and he

13      did.

14   Q    Okay.

15   A    I had the shotgun pointed at him.

16   Q    Did you secure him?

17   A    Yes.  That has a tendency to keep people in place.

18   Q    Anybody else in the house that you saw at that time?

19   A    Once he was detained and other officers physically detained

20      him, I proceeded to the back of the house.  In the back

21      of the house was a female also holding a small child.

22      She was later identified to me as Sheila Bufkin.

23   Q    Is she in this room?

24   A    Yes, she's also seated at counsel table.

25   Q    Let's talk about the briefcase for a minute.  You said

12

1    black case.  What kind of case was it?

2  A    It's a black leather attache case similar to the case you

3    have on your table.

4  Q    Did you open it?

5  A    Yes, I did.

6  Q    What was in it?

7  A    There was a set of keys.  There was a wallet with Mr. Rashad's

8    identification, picture identification and stuff in it.

9    There was what would be called tally sheets

10    as to amounts of money given to people, amounts of cocaine

11    tally sheets.

12    MR. HENRY:  Your Honor, I object to that.

13    I object to that as being speculative.  I doubt seriously

14    if these sheets contained in any briefcase showing amounts

15    of cocaine.  I think he can testify to what he saw and

16    not speculate on what they represented.  He's no expert.

17    He's a police officer with limited experience at that.

18    MR. HEALY:  Indeed.  Perhaps we ought

19    to explore that.

20    MR. HENRY:  I think you ought to explore

21    it.

22    MR. HEALY:  All right.

23    EXAMINATION

24  BY THE COURT:

25  Q    You say you saw what now?  You saw sheets and what?

13

1    A    Tally sheets that indicated the amounts in dollars that

2         had been either put out or received.

3    Q    How do you know that?

4    A    There is a dollar sign and numbers.

5    Q    How do you know that?

6    A    There was dollar signs, decimal points.

7    Q    How do you conclude that it represents all of that by what

8         you see?

9                      MR. HEALY:   He wants to know what experiene

10        you got.

11                     THE COURT:   I'm not asking about experience.

12        I'm not asking him about that at all.   That's not at all

13        what I'm asking him.   I'm asking him how does he know or

14        how does he conclude all of that based on what he saw.

15        The experience has nothing to do with that.

16                     MR. HEALY:   The experience has nothing

17        to do with foundational questions?

18                     THE COURT:   It has nothing to do with

19        him giving that answer.

20                     MR. HEALY:   I don't understand that.

21   Q    (By the Court)   Your answer was what?

22   A    Excuse me, your Honor?

23   Q    Your answer was what about the sheets?

24   A    Could you repeat the question?

25   Q    I'm not repeating anything.   You answer the question.

1  If you don't answer the question, I'm striking all of your

2  testimony.  I'm striking every word that you stated.  You

3  can play games if you want to, but you don't play games

4  with me.

5               MR. HEALY:  I would like to make a record.

6               THE COURT:  You make a record.

7               MR. HEALY:  Thank you.  This witness has

8  endeavored to answer the questions that were put to him.

9  A challenge was made in respect to his expertise.  The

10  normal way of responding to that is to go into the witness's

11  experience in the field.  I endeavored to do so, the Court

12  told him then if you were not, that is to say the Court

13  was not interested in establishing his experience as a

14  matter of expertise, that you only wanted him to answer

15  the question.

16               THE COURT:  All I want him to do is answer

17  the question.  We will deal with his experience at a different

18  time.

19               MR. HEALY:  When he asked you what the

20  question was you refused to repeat the question.

21               THE COURT:  You don't understand the question?

22               THE WITNESS:  No, sir, not at this time.

23               THE COURT:  Give him the question again.

24               MR. HENRY:  How do you know what these

25  entries on the so-called talley sheets represent or that

15

1    they represented cocaine and the amounts that were going

2    to be paid for cocaine, which was your testimony.

3                    EXAMINATION (Continued)

4  BY THE COURT:

5  Q    Now do you understand what the question is?

6  A    Yes.

7  Q    Well answer it.

8  A    By the numbers that were written, okay, it indicated amounts

9       of money on the sheets.  And there are in terms of numbers

10      and letters that indicate what was transpired on that sheet

11 Q    What were the letters?

12 A    "K".

13 Q    Which you take to represent what?

14 A    Kilo.

15 Q    What else?

16 A    That's it.

17              THE COURT:  I'm going to sustain the objection.

18              DIRECT EXAMINATION (Continued)

19 BY MR. HEALY:

20 Q    All right.  Now among the items that you examined in the

21      briefcase, you said you found some items of identification

22      that related to the defendant Rashad, is that a fair statement?

23 A    That's correct.

24 Q    Did any of those items give an address?

25 A    Yes.

                                                            16

1   Q   Can you tell me if the address was that of 20219 Greydale?

2   A   I don't recall if there was anything on the Greydale address

3       indicating that.

4   Q   Do you remember if there were other addresses given in

5       respect to defendant Rashad?

6   A   Yes.

7   Q   But you don't remember seeing anything that had Greydale

8       on it?

9   A   I don't recall anything on Greydale on it.

10  Q   Now, with respect to the keys that you found in that attache

11      case, did you try those keys in any of the locks on Greydale

12      such as the front door?

13  A   Yes, I tried the front door.

14  Q   Did it work?

15  A   Yes.

16  Q   Did you try it on the Master lock?  Withdrawn.

17      Can you tell me if you went down in the

18      basement of that house?

19  A   Yes, I did.

20  Q   Can you tell me if you saw an area underneath the stairs

21      in the basement of that house?

22  A   Yes, I did.

23  Q   Can you tell me if you found a padlock that relates to

24      the area underneath the stairs?

25  A   Yes, I did.

17

1    Q    Did you try any of the keys in that padlock?

2    A    Yes, I did.

3    Q    By keys, of course, I'm still talking about the ones from

4         the briefcase.

5    A    That's correct.

6    Q    Did any of those keys work?

7    A    Yes, one did.

8    Q    Okay.  That is to say unlocked the padlock, is that a fair

9         statement?

10   A    That's correct.

11                      MR. HEALY:  Cross-examine.

12                      CROSS-EXAMINATION

13   BY MR. HENRY:

14   Q    Sir, you went down in the basement and when you got down

15        there the door was open?

16   A    Yes.

17   Q    The padlock was on the floor?

18   A    No.

19   Q    But the padlock was not on the door, it had been stripped

20        off of the door?

21   A    It wasn't on the floor.

22   Q    Where was it?

23   A    It was locked on the hasp part that held the door closed.

24   Q    And why did you want to put the key in that padlock?

25   A    To see if it worked.

1  Q   Because you already had found inside something that you

2      suspected to be narcotics?

3  A   That's true.

4  Q   And your warrant did not give you authority to make any

5      exploratory search throughout the premises, did it?  It

6      told you to search for narcotics?

7  A   That's correct.

8  Q   It didn't give you any right to go in and take keys and

9      try them in the various doors of the premises that you

10     were already in, did it?

11 A   It certainly does.

12 Q   Let me show you what purports to be the search warrant.

13 A   I saw the search warrant.

14 Q   Well, would you read for me what's in there that authorizes

15     you to take keys after you have found the drugs and then

16     try them out in a lock?

17 A   It doesn't verbally say that.

18 Q   It doesn't, does it?

19 A   (No response.)

20              MR. HENRY:   That's all.

21              MR. HEALY:   No further questions.   Send

22     in Johnson.

23              J E R R Y    J O H N S O N    ,

24     was called as a witness by the People, and having been

25     first duly sworn by the Court Clerk, was examined and

1    testified as follows:

2                        DIRECT EXAMINATION

3  BY MR. HEALY:

4  Q    Your name, your rank, your duty assignment as of September

5       7, 1988, please.

6  A    Police Officer Jerry Johnson, currently assigned to the

7       Narcotics Division.

8  Q    Were you a part of the entry team that went into 20219

9       Greydale on that date in the execution of a search warrant?

10 A    Yes, sir, I was.

11 Q    Did you take custody of any of the people inside the house?

12 A    Yes.

13 Q    Who did you take custody of?

14 A    The defendant, Sheila Bufkin.

15                  MR. HEALY:  Indicating the defendant,

16      Sheila Bufkin.

17 Q    (By Mr. Healy) When you were through with the search, did

18      you convey Sheila Bufkin downtown?

19 A    Yes.

20 Q    Before you conveyed her downtown, did you use a Detroit

21      Police Interrogation Sheet in order to get information

22      from Sheila Bufkin?

23 A    Yes, I did.

24 Q    And did you also use a Detroit Police standard Constitutional

25      Rights Certificate of Notification form?

1   A   I did, yes.

2   Q   Now, in respect to the Constitutional Rights Certificate

3       of Notification form, did you notify Ms. Bufkin of her

4       so-called Miranda rights by use of that form?

5   A   Yes, sir.

6   Q   Now, that same language, not exactly the same form, but

7       the same language also appears at the top of the interrogation

8       sheet, does it not?

9   A   Yes.

10  Q   And did you use that as well to inform Ms. Bufkin of her

11      rights?

12  A   Yes, I did.

13  Q   Did you have her sign both?

14  A   Yes.

15  Q   After she had signed both, did she make any requests of

16      you in respect to those rights?

17  A   No.

18  Q   You hesitated.  Is there some doubt in your mind?

19  A   I was just thinking.

20  Q   Is your answer still the same?  I don't mean to confuse

21      you.

22  A   I understand.

23  Q   Is it your testimony that she had no questions of you in

24      respect to her rights?

25              MR. HENRY:  He didn't say that.  He hasn't

                                                        21

1    answered.   As a matter of fact, at least a minute has taken

2    place and he has been very thoughtful about answering that

3    question.

4                       MR. HEALY:   I beg your pardon.   He did

5    answer it.   And then I asked him if he had paused before

6    he made the answer and that's when we got into the second

7    part of it.

8                       THE COURT:   What is the question now?

9     The second question?

10                      MR. HEALY:   I asked him whether she had

11   asked any questions, made any requests of him following

12   his advising her of her rights.

13                      THE COURT:   And the original answer wass

14   no?

15                      MR. HEALY:   That's correct.

16                      THE COURT:   The second question was what?

17                      MR. HEALY:   Essentially the same.   I said

18   he seemed to pause and I asked him if there were any doubts

19   in his mind about that.

20                      THE COURT:   And what is your answer?

21                      THE WITNESS:   No.

22                      MR. HEALY:   Okay.

23  Q   (By Mr. Healy)   Did you take the statement using the

24   interrogation sheet?

25  A   Yes, I did.

1  Q    And would it be on four pages?

2  A    Yes.

3                  MR. HEALY:   Counsel, do you have a copy

4       of those four pages?

5                  MR. HENRY:   I object to any statement

6  made by Ms. Bufkin at this time and move for suppression

7  of it.   People vs. Summers, 68 Mich App 571.  I do have

8  a Memorandum of Law which I will give the Court on that.

9                  There is no basis for making the arrest,

10  no probable cause, therefore, to take a statement from

11  her at that point.  The mere fact she's present in the

12  premises is not a sufficient basis to arrest her, and the

13  arrest is illegal, therefore, the statement is illegal;

14  and the Summers case is clearly on that point.  It does

15  deal with exactly the situation like this.

16                  As a matter of fact, Summers was shown

17  to be the owner of the premises.  Officers had executed

18  the search warrant.  They found drugs in a secreted place

19  and they arrested Mr. Summers and then wanted to introduce

20  what they found on him into evidence.

21                  The Court clearly said it couldn't be.

22  There is no probable cause.  And I have a copy of the Summers

23  opinion with me and I have underlined some of them which

24  points out that in this situation where the drugs are found

25  in an out of the way place, the mere occupancy by the

23

1    defendant with anyone else in the dwelling in which it

2    is located, does not provide probable cause for the arrest

3    of the person.   Therefore, any statement that she made

4    under those circumstances is unlawful and cannot be received.

5                    THE COURT:  Did you want to go forward,

6    counsel?

7                    MR. HEALY:  Certainly.  I would ask counsel

8    whether Summers deals with the fact of the Fifth Amendment

9    rights?

10                    MR. HENRY: What?

11                    MR. HEALY:  The Fifth Amendment rights,

12   that's what we are talking about.

13                    MR. HENRY:  My brief is clear and I'm

14   relying on the Summers case.  My brief is clear.  You made

15   an illegal arrest of this young lady.  No problem because

16   to arrest her you can't make a statement, take her down

17   to the station and have her make a statement and sign her

18   rights.  Never been arrested before in her life.  Pure

19   as the driven snow.  Working in a bank.  Never been arrested,

20   and you take her down there to the Police Station and then

21   want her to give a statement.

22                    MR. HEALY:  I didn't ask for a speech.

23   The search warrant names Sheila Bufkin as someone to be

24   searched.

25                    MR. HENRY;  Does that give them the right

24

to arrest her?  They found nothing on her.  She's got a
baby in her arms.

THE COURT:  Let me see the search warrant.
Let me read what the search warrant indicates here.  "The
Sheriff or any peace officer of said county, Police Officer
Steve Shannon, affiant, having subscribed and sworn to
an affidavit for a search warrant, and I having under oath
examined affiant, am satisfied that probable cause exists:

Therefore in the name of the People of
the State of Michigan, I command that you search the following
described place:  The entire premises and all out-buildings
of single-family dwelling located at 20219 Greydale, Detroit,
Michigan.  The house is the third house north of Trojan
on the west side of Greydale and has decorative Armour
Guard grates on the doors and windows.  The persons of
Sheila Bufkin, a black female, her husband whose first
name is unknown, but his last name is also Bufkin; and
a black female whose first name is Melody and whose last
name is unknown.

And to seize, secure, tabulate and make
return according to law the following property and things:
All suspected controlled substances, all items used in
connection with the sales, manufacture, use, storage,
distribution, transportation, delivery or concealment of
controlled substances.  All books, records and tally sheets

25

indicating sales of controlled substances. All pre-recorded

funds used to make purchases of controlled substances,

all monies and valuables derived from the sale of controlled

substances and any items obtained through the sale of

controlled substances. All firearms and items establishing

ownership, control, occupany or possession of the above

described place.

The following facts are sworn to by the

affiant in support of the issuance of this warrant:

Affiant is a Detroit Police Officer assigned

to the Conspiracy Unity of the Narcotics Division.

Affiant's crew is using a source of

information hereinafter known as SOI, who has made four

controlled buys of cocaine for affiant's crew, and as a

result executed one search warrant resulting in one arrest

for Possession With Intent to Deliver, with other cases

still pending.

SOI has supplied good information about

narcotic trafficking. For example, last week SOI told

affiant of a black Lincoln limousine of a particular license

plate in which SOI has seen several kilograms of cocaine.

The plate came back to an address which affiant's crew

was already familiar. Indeed, affiant was watching that

address a year ago when a four-wheel drive truck from the

address literally chased the affiant's car away from the

26

scene.

During the last week, the crew has watched the suspect address, seen the Lincoln in question as well as another Lincoln similarly registered, followed the second Lincoln, and observed a pattern of drop-offs.  Affiant's crew expects to take action in respect of these events.

In addition, SOI supplied information on six other narcotic locations, and that information was verified by information already in police files.

SOI also describes his/her personal observations concerning 20219 Greydale.  SOI reports that the main operator is Sheila Bufkin's husband, but that Sheila Bufkin and another black female, Melody are involved in the moving of dope from the Greydale address.

SOI says that no one is allowed to come to the address for pick-ups of cocaine and that Melody does the delivering of quantities no smaller than an ounce and as large as kilograms.

Last week SOI reports seeing several kilograms, SOI couldn't get a count, and today is 9-7-88, SOI saw more packages the same size on the premises."

Signed Steve Shannon, affiant.  Page one of two pages.  Subscribed and sworn to before me and issued under my hand, 7th day of September 1988, Magistrate, whatever it says, 36th District Court.

27

1            "Affiant's crew had Melody pointed out

2 to them and followed her to a known dope location.

3            On 9-2-88, police surveillance of 20219

4 Greydale disclosed two men with guns who tried to get in

5 the Greydale address, but no one appeared to be home.

6 Because large quantities of cocaine are involved, one would

7 not expect a discernable pattern of traffic such as might

8 be found where retailing takes place.  The cars at the

9 address are registered to Sheila Bufkin, but to another

10 address, and the utilities are paid by Sheila Bufkin.

11            Affiant's knowledge of the narcotic trade

12 indicates that weapons and/or explosive or incendiary devices

13 are commonly used in the connection therewith; that monies

14 or other assets derived from the trade are often found

15 at the sites of narcotic related search warrant executions;

16 and that records relating to narcotic transaction or hiding

17 of proceeds from such transactions are commonly kept in

18 the course of illegal drug trafficking, and likewise, are

19 frequently found at the sites of search warrant executions.

20            This is the Return to Search Warrant.

21 "I hereby certify and return that by virtue of the within

22 search warrant to me directed, I have searched for the

23 goods and chattels therein named at the place therein

24 described; and that I have such goods and chattels before

25 the Court described as follows:  Approximately seven kilos

28

of powdered cocaine. ( 1 ) box containing assorted

paraphernalia.  (1)NEC portable telephone, serial number

7T-110198.  (1) Leather briefcase, black.  (1) Ram Motorola

beeper, serial number 601129.  (1) Ram beeper, serial number

304632.  Miscellaneous pictures.  (1) Padlock, Master.

$530, narcotic proceeds.  $83.  (1) Ohaus Scale.  (1) Lincoln,

gray.  It cites the number. (1) Nissan Pathfinder.  It

doesn't cite the VIN number on that.  Dated 12:15 a.m.,

7th day of September, 1988, 20219 Greydale, signed by

Municipal Police Officer Anna, whatever."

EXAMINATION

BY THE COURT:

Q    Let me ask you this, Officer, did you arrest Ms. Bufkin?

A    No, she was detained. I didn't arrest her, no.

Q    When you say detained, does that mean she was free to go?

A    No, she was placed in the central location where all prisoners

are situated on the raid.

Q    At what point was she arrested, if she ever was?

A    Cuffs were placed on her and we were about to leave.

Q    Did you do that?

A    No, I did not.

Q    Were you present when it was done?

A    I don't think so.

Q    When did you take a statement from her?

A    At the location at her home.

29

1  Q   And you are telling me when you took the statement she

2      wasn't under arrest?

3  A   I heard her mention that it wasn't her dope.

4  Q   I'm not asking you what she mentioned. When you took the

5      statement from her, was she under arrest or not?

6  A   Yes, sir, I suppose she was.

7  Q   And what was she under arrest for?

8  A   Violation of Controlled Substances Act.

9  Q   Okay.  Specifically?

10 A   Possession of Cocaine.

11 Q   Did you find any narcotics on her?

12 A   No, I did not.

13 Q   Did anybody find any narcotics on her?

14 A   I don't think so, no.

15 Q   Of all the narcotics that were found in the house, was

16     there any found that was other than in the basement in

17     this little cut-out little room, was any other narcotics

18     found anywhere else other than in that little room?

19 A   I don't think so.

20 Q   So all the narcotics that was gotten from that house came

21     from that basement room, whatever it was?

22 A   I didn't retrieve it.

23 Q   I'm not saying that you did retrieve it.  But if you know,

24     was there any other narcotics found anywhere in the house?

25 A   I really don't know.  I can't say.

30

THE COURT:  I would like to hear some
more argument as to why she can't be charged.

MR. HEALY:  The issue before you now is
not why she's being charged, but whether the statement
she made is admissible here.

THE COURT:  I want to hear argument about
that, counsel, if you don't mind.

MR. HEALY:  I am more than happy to make
it.

THE COURT:  Then why don't you start.

MR. HEALY:   The reason why she is held
at that time is because she is one of two people in the
house where she was the possessor of the house.  There
is evidence there that she is in possession of the house.
That she lives there; and there is something like 14 pounds
of cocaine found in the basement of it.

There is only one person in the house
which is the defendant Rashad, according to the testimony
so far.  He has with him identification which does not
relate to that address but rather to other addresses, so
she is held because she is in the house.  She lives in
the house.  Got several kilos of cocaine in the house and
the house belongs to her.

Now possession need not be exclusive.
Control need not be exclusive.  And the law cited by defense

31

1   here first of all is law that doesn't have to do with probable

2   cause to arrest.  It has instead to do with what constitutes

3   proof beyond a reasonable doubt which is altogether different.

4            In order to buy the theory of defense,

5   you would have to say the police have no right to arrest

6   and interrogate those found on the premises of a house

7   in which 14 pounds of cocaine is found, and I think that's

8   silly.  If that's the law, we might as well fold up shop

9   and quit.

10            MR. HENRY:  Then get ready to quit because

11   that's the law.  The case we cited I thought was clear

12   without any ability of being disputed.  On page three of

13   my memorandum, the last words from the case of People vs.

14   Summers is, "Under those circumstances we must hold that

15   the police officers had no probable cause to arrest the

16   defendant for knowingly possessing the drugs found in the

17   basement of the home."

18            It's exactly the same thing here.  They

19   had no probable cause.  The fact she may have owned the

20   home, which again is something that is a question, but

21   even if she did, they had no probable cause to arrest her

22   because they found it in a secreted place in the home behind

23   a lock which she didn't have a key to.  No indication she

24   had access to it.  Nothing indicating she went there.

25   They didn't have probable cause to arrest her for the

32

possession of those drugs and knowingly possession of those

drugs.

That's not any weird principle of law.

The Summers case deals with the same thing.  The drugs

they were trying to get this man on were drugs found in

his pocket after they arrested him.  They arrested him

on the basis of presence of drugs alone, and they can't

do that.  They can't take this young girl out of her house

on the basis of that.  Nothing more.  Just the mere fact

she's living there or may have the ownership of the house,

that's what Summers had, he had ownership of the house,

but there was no probable cause to make the arrest of Summers

and, therefore, the drugs they tried to prosecute him for,

found in his pockets on the indication of a search had

to be excluded.

Likewise her statement had to be excluded

because they have arrested her when there is no basis,

no probable cause to arrest her.

THE COURT:  Then, therefore, the basis

for arresting the other defendant is based on the keys

that were found in the sactchel that he had or whatever?

MR. HENRY:  That is correct.  That is

within the Summers case too.  If they had any other case,

unfortunately which is cited in the Richardson case, if

there was some other evidence that he exercised control

33

or had the right to exercise control such as evidenced

by a key and that sort of thing, then that becomes a different

situation.  But it certainly doesn't apply to a person

where there is no evidence that they had the control.

Moreover a safe for example where there

is no showing a person has the combination of it or the

means of getting into this secreted place or that they

even knew it was there.

THE COURT:  You are saying that the statement

she made should be suppressed for what reason?

MR. HENRY:  For the reason it was made

at a time when she was illegally arrested.  They illegally

arrested her.  Even by their admission, okay, the statement

it shows on the front of it it was taken at Police Headquarters,

while the testimony of the officer is he took the statement

in the house.  I don't know how they can get back and forth.

It says at, Headquarters of the Police Department."  Even

so she was under arrest and he admitted that, and the arrest

was illegal because they had no basis.  Now they want to

use that and have her make a statement, and on the basis

of that try to buttress their position and bring a case

against her.

THE COURT:  I would like to hear some

discussion.  Do you have other witnesses that can establish

her ownership of this house?

34

1        MR. HEALY:   The ownership of the house

2   can be put in in two ways.   One is through the statement

3   she makes herself, which is through this witness and through

4   other items that are seized from the house at the time.

5        THE COURT:   Why don't we deal with those

6   other items that were seized.

7        MR. HEALY:   Okay.   We will have Johnson

8   step down and go out in the hallway and put McNamara back

9   on.

10       A R T H U R   M c N A M A R A   ,

11  was called as a witness by the People, and having been

12  first previously duly sworn by the Court Clerk, was examined

13  and testified further upon his oath as follows:

14                  REDIRECT EXAMINATION

15  BY MR. HEALY:

16  Q   Sgt. McNamara, first of all did you take steps to, before

17      the execution of this search warrant, to check with any

18      of the utilities in the City of Detroit to see who was

19      paying the utilities at that address?

20  A   Yes.

21  Q   And can you tell me which utility you checked?

22  A   Water Department.

23  Q   All right.   And what information did you get back?

24  A   Got the information that Sheila Bufkin was paying the bills,

25      and I got a phone number there for the address also.

35

1   Q   Now, at the scene while you were in the process of executing

2       the search warrant, did you find any proof of residency?

3   A   Yes, her driver's license.

4   Q   And can you tell me what address was given on the driver's

5       license?

6   A   20219 Greydale.

7   Q   Similarly, did you find any driver's license for defendant

8       Rashad?

9   A   There was a driver's license for Mr. Rashad, I don't recall

10      the address right now.

11  Q   Can you tell me if you recall whether it was the Greydale

12      address or some other address?

13  A   It was not the Greydale address.  Also car registration

14      to her Mazda.  Also surveillances.  There was letters on

15      the premises.  There was information from our SOI.

16              MR. HENRY:  Now if you get into that I

17      will ask for the name of that SOI.  I object to that because

18      you want to use him when you can and keep him hidden.

19      What is the name of the SOI?

20              MR. HEALY:  You are not serious.

21              MR. HENRY:  I am serious.  Under Robeaera

22      (Phonetic spelling) vs. United States.  I didn't mean it.

23      I want the name of th SOI.

24              MR. HEALY:  Challenge made as to whether

25      there is probable cause.

                                                            36

1          MR. HENRY:  To arrest her.

2          MR. HEALY:  That's correct.

3          MR. HENRY:  And I'm asking for the name

4    of the SOI since he's now giving this as one of the reasons

5    he is basing it on her ownership of the property.  The

6    SOI is the thing if you want to retract that, that's fine.

7          MR. HEALY:  The information that he has

8    for the search warrant can certainly go into whether or

9    not there is probable cause to make the arrest.

10          MR. HENRY:  The search warrant doesn't

11   authorize the arrest of that individual; and you know the

12   case law as well as I do.  The search warrant has to state

13   who may be arrested if you are going to arrest somebody

14   or search.

15          MR. HEALY:  That's not what I said.  I

16   said the information contained in the search warrant can

17   be used as probable cause for an arrest.  I didn't say

18   that the search warrant authorized the arrest.

19          MR. HENRY:  I don't want to get into that

20   right now.

21          MR. HEALY:  I thought we were already

22   in it.  That's the objection you raised.

23          MR. HENRY:  Counsel, I'm not going to

24   argue with you.

25

37

1                    RECROSS-EXAMINATION

2    BY MR. HENRY:

3    Q    Sir, you have claimed to this Court under oath that the

4         driver's license of Ms. Bufkin, which you have possession

5         of, contains the address of 20219 Greydale, is that right?

6    A    If my memory serves me correct.

7    Q    Suppose you get the license for us.  You must have it here?

8    A    I've got it within two minutes from here.

9    Q    Please get it for us.  That's the first thing.

10                   MR. HEALY:  You take orders from the Court

11        and not from defense counsel.

12                   MR. HENRY:  I request he produce the driver's

13        license.

14                   THE COURT:  Do you have that available?

15                   THE WITNESS:  It's out in the vehicle.

16                   THE COURT:  Whatever else you have pertaining

17        to this, just bring it in here so you don't have to keep

18        running out of here.

19                   THE WITNESS:  I could run over to the

20        property room and pick up the rest of the items.  You want

21        me to do that?

22                   THE COURT:  Go ahead.

23                   MR. HEALY:  We might as well recess this

24        case for awhile, your Honor, because it will take him awhile

25        to go over to the property room.

1          MR. WENZEL:  Thomas Wenzel.  I was initially

2    assigned to this case.  I was informed by Mr. Healy that

3    he would be taking over this case, and I want the record

4    to reflect I was here and prepared to prosecute.

5          THE COURT:  All right.

6          (At 4:15 o'clock p.m., a recess was had.

7          At 4:42 o'clock p.m., Sgt. Arthur McNamara

8          resumed the stand and the following

9          proceedings were had in open court:)

10          REDIRECT EXAMINATION

11   BY MR. HEALY:

12   Q    Sgt. McNamara, you want to correct some of the testimony

13        with respect to the license, the driver's license?

14   A    Yes.  The driver's license comes back to 20192 Schafer.

15   Q    It does not come back to the address in question?

16   A    No.

17   Q    On how many occasions did you see that car -- withdrawn.

18          You testified that you had observed a

19   car which is registered to Defendant Bufkin which also

20   comes back to the Schafer --

21          MR. HENRY:  He said the Mazda was to the

22   Greydale address.  If he wants to change it we will accept

23   it.

24          MR. HEALY:  Well let's find out what it

25   is.

39

1          THE COURT:   I remember him testifying

2     about a Mazda.   I don't remember what address he stated.

3  Q   (By Mr. Healy)   What address did the Mazda come back to?

4  A   I did not state an address on the Mazda address.   I stated

5     that if my memory serves me correctly the driver's license

6     came back to the Greydale address.   I was wrong.   The Mazda

7     which I just ran in the computer now I find that it does

8     come out to the Schafer address and the driver's license

9     also comes to the Schafer address.

10 Q   How many times did you see the Mazda in the driveway on

11    the Greydale address?   Was that frequent or infrequent

12    or what?

13 A   Very frequently.   Usually I would late at night drive by and

14    the Mazda would be in the driveway practically every night.

15    I was watching the house for approximately two months.

16          MR. HEALY:   Okay.   That's all I have.

17               RECROSS-EXAMINATION

18 BY MR. HENRY:

19 Q   Now I'm going to show you a registration to that car, Michigan

20    registration; and that is to a Mazda, isn't it?

21 A   Yes, it is.

22 Q   And what particular license is that?

23 A   That's 658 UEN.

24 Q   And that's on Schafer?

25 A   Yes.

                                                          40

1   Q   Did you check the ownership of the home?  Did you ever

2       bother since you said you were checking on the ownership,

3       did you ever bother checking to see who was the owner of

4       the home of record?

5   A   Not of record.  I had a utility check done on that house.

6   Q   You went to a utility and you asked them who pays the utility

7       bills?

8   A   Who was paying the bill.

9   Q   And who paid a bill for when?

10  A   I did not get all of the particulars.  I can get that,

11      though.

12  Q   But you didn't get it and you didn't have that in hand

13      to know when it was that she supposed to pay a utility

14      bill?

15  A   When you get a utility check, it would be the current named

16      address of the person that is paying the bills there.

17  Q   When did you get the utility check?

18  A   Approximately two to three weeks ago.

19  Q   Two weeks before the --

20  A   Before the search warrant, yes.

21  Q   Two weeks before the search warrant, and that's the only

22      indication that you had of any ownership of this property?

23  A   Correct.

24  Q   And you don't know under what circumstances she was paying

25      her bills, do you?  The water bill?

41

1   A   All I know it was registered in her name.  I don't know.

2   Q   You don't know?

3   A   No.

4   Q   Didn't say she was the owner of the property?

5   A   I didn't get that.

6   Q   Did you find any papers indicating her ownership?

7   A   Inside the house?

8   Q   Yes.

9   A   Yes, we did.

10  Q   What?

11  A   I don't know.  I don't have them.

12                      MR. HENRY:  That's all.

13                      MR. HEALY:  You can step down.

14                      THE COURT:  Anything else?

15                      MR. HEALY:  I will put Johnson back on.

16                      THE COURT:  By all means.

17            J E R R Y   J O H N S O N   ,

18     was called as a witness by the People, and having been

19     first previously duly sworn by the Court Clerk, was examined

20     and testified further as follows:

21                      REDIRECT EXAMINATION

22  BY MR. HEALY:

23  Q   Let the record show Officer Johnson has retained the stand.

24                  Officer Johnson, did you ask some preliminary

25     questions of Defendant Bufkin such as her name?

                                                              42

1    A    Yes.

2    Q    Did you ask her where she lived?

3    A    I did, yes.

4    Q    And what did she tell you when you asked her that kind

5         of preliminary question?

6    A    She gave me the address of 10219 Greydale.

7    Q    That's an address I have never heard of.

8              THE COURT:  Maybe he's got the wrong numbers

9    in place.   Maybe he's got the numbers switched around.

10             THE WITNESS:  Excuse me.  20219.

11             MR. HEALY:  That's all I have, your Honor,

12   on the question of evidence of proof of residency.

13             THE COURT:  Do you want to cross-examine,

14   Mr. Henry?

15                   CROSS-EXAMINATION

16   BY MR. HENRY:

17   Q    The proposed statement that you said you took in the house

18        has on it the place of location as Headquarters, right?

19   A    Yes.

20   Q    So then did you take the statement that you wanted to get

21        in now at Police Headquarters or did you take it at her

22        home?

23   A    I took it at her home.

24   Q    But you put Headquarters on the top?

25   A    Yes, that's common practice.   Just made an error.   That's

                                                           43

1    all.

2    Q    You went out to the home with a police interrogation form?

3    A    Yes, we always do.

4    Q    You always do that?

5    A    Yes.

6    Q    And you began to ask her where she lived and so forth?

7    A    Yes, I did.

8    Q    Why did you do that?

9    A    For the report.

10    Q    Your report could have indicated whom you found owned the

11    home and now you want to ask her where she lived?

12    A    What are you saying?

13    Q    The truth about the matter is you wanted to use that as

14    a means of incriminating her, didn't you, in this respect

15    to drugs found in the basement?

16    A    It's just routine questions always asked.

17    Q    You knew drugs had been found in the basement?

18    A    Yes.

19    Q    You knew no drugs were found on her?

20    A    That's correct.

21    Q    You knew also that she had the baby in her arms when you

22    came in?

23    A    That's correct.

24    Q    And as a matter of fact you really took her upstairs and

25    then put handcuffs on her?

44

1  A    No, I didn't put handcuffs on her at all.

2  Q    Was she upstairs, taken out of the area?

3  A    Yes.

4  Q    By herself?  Isolated?

5  A    There were other people up there.

6  Q    Who were they?

7  A    Different officers.

8  Q    Other police officers?

9  A    Yes.

10  Q    Where did you write up this statement?

11  A    In the bedroom.

12  Q    On what?

13  A    On a dresser.

14  Q    On a dresser?

15  A    Yes.

16  Q    How many other officers were there in this room?

17  A    They were in and out.

18  Q    In and out?

19  A    Yes.

20            MR. HENRY:  I think that makes the situation

21  clear enough, your Honor.  I just renew my objection.

22            THE COURT:  Your objection as to the

23  admission of the statement?

24            MR. HENRY:  Yes.

25            THE COURT:  On the basis they didn't have

1      probable cause to arrest her in the first place?

2                    MR. HENRY:  That is correct.  At the time

3      it was taken she was unlawfully detained and being questioned.

4      I suggest the statement is a product of an unlawful arrest.

5                    THE COURT:  Well, I have read over these

6      cases that you have cited here, Summers, embedded in the

7      Summers case is the Davenport case which goes into detail

8      about such matters.

9                    What is interesting about this situation

10     as well as it relates to the Summers case is that they

11     talk about joint ownership in this case.  They said they

12     established it even with the establishment of joint ownership.

13      I will cite.  I will quote from the case specifically

14     what I'm talking about.  I am reading from the Summers

15     case starting at the bottom of page 584.  The citation

16     is 68 Mich Appeals 571.  I am starting to read from the

17     bottom of page 548 going over to 585.

18                    "In the instant case, none of

19         those additional factors were present.

20         Defendant was known to be the owner and an

21         occupant of the house, and drugs were found

22         in an out-of-the-way place in that house.

23         However, there was no other evidence linking

24         defendant to those drugs at the time of his

25         arrest."  They are talking about the Summers

case.

"We have the same set of facts as described in Davenport.  Mere joint occupancy by the defendant with other of  a dwelling in which illegal drugs are located.  It is certainly as likely that Dwight Calhoun, or one of the other persons on the premises placed those drugs in the basement.

Under those circumstances, we must hold that the police officers had no probable cause to arrest defendant for knowingly possessing the drugs found in the basement of his house.  The seizure of the heroin involved here cannot be justified as the product of a search incident to arrest. Since the other possible legal basis for the search ahve also been rejected, we must up hold the decision of the trial judge suppressing the evidence and quashing the information."  That is the Summers's matter.

I re-read the Davenport case for whatever it is worth.  You may or may not remember that case, but at any rate in that case certainly joint if not ownership but occupancy was certainly established against Davenport, and he was charged with some narcotics that were found

47

1    in the basement in a hamper of some dirty clothes; and

2    defense counsel did object to him being charged with that.

3    And he motioned to suppress and it didn't fly, and he went

4    to trial and he lost and he went to prison.  That is to

5    say Davenport.  And the Supreme Court reversed that decision

6    and that wass Justice Levin's writing of that decision.

7            Just let me read from that Davenport matter

8    because I think it bears directly to the Summers case as

9    to the two cases bear directly on this case to the facts

10   in this case at least.

11           The Court is reading on page 580.  This

12   is 68 Mich Appeals 571.  I am reading page 580, middle

13   paragraph.

14           "The prosecutor's final claim is that

15       the police had probable cause to arrest defendant

16       for possession of the narcotics found in the

17       basement of the house.  If that contention is

18       true, then the police properly searched the

19       person of defendant incident to that arrest.

20       The trial judge, however, ruled that the police

21       lacked probable cause to arrest the defendant.

22       He found that People vs. Davenport, 39 Mich App

23       252 to be controlling here and we agree.

24           In Davenport, police officers went

25       into a house where defendant resided with

1   three other persons for the purpose of

2   executing a search warrant for those

3   premises. As the police broke down the

4   door to gain entry, they observed the

5   defendant running upstairs with a small

6   box. The police reached an upstairs

7   The police reached an upstairs

8   bathroom in time to retrieve three envelopes

9   and a bit of lose marijuana as the defendant

10   attempted to flush them down the toilet.

11   Marijuana was also found in those envelopes.

12   As search of the whole house was then conducted,

13   and a bag of narcotic paraphernalia and .26 grams

14   of heroin were found in the basement.

15   Both items were at the bottom

16   of a barrel of soiled clothes, and the heroin

17   was contained in a prescription bottle bearing

18   defendant's name for another non-narcotic drug.

19   the Court in Davenport held that

20   there was insufficient evidence to support a

21   jury verdict convicting Davenport of possession

22   of the .26grams of heroin.  Judge, now Justice

23   Levin, writing for the Court expressed the

24   reasoning of the panel as follows:"

25   This is on page 581 of People vs Summers

1   matter.  I'm quoting:

2                "Davenport cannot be convicted

3         on the theorem that someone must have been

4         in possession of the heroin.  Davenport's

5         residence in the house and the presence

6         in the bag of a plastic bottle carrying

7         a label bearing his name were the only

8         evidence connecting him to the heroin

9         found in the brown bottle.

10               Four persons lived in  the

11        house.  It is not reasonable to infer from

12        the fact that Davenport was one of the

13        occupants that he rather  than Phillips or

14        Brown or Green was the person who placed the

15        capsules in the brown bottle.  In addition

16        to the plastic bottle labeled with Davenport's

17        name, there were two plastic bottles bearing

18        the name of one of the other residents,

19        Ardis Phillips.  There was no evidence that

20        the brown bottle, the bag or the barrel

21        belonged to Davenport.

22               Clearly there were innocent theories

23        unrebutted by any evidence which accord with the

24        facts.  It is as likely that Ardis Phillips or

25        anyone else living in the house who would have

50

1   had equal access to the basement was in

2   possession of the heroin.

3            More than mere association must

4   be shown to establish joint possession.  An

5   additional independent factor linking the

6   defendant with the narcotic must be shown.

7   And it's 39 Mich App 252."  That's the end of the

8   quote.

9            What we have is the search warrant, as

10  the State's attorney has indicated, which gives the information

11  as it relates to Ms. Bufkin, and the fact a large quantity

12  was found, I suppose what the State's attorney is saying,

13  how could anyone have that amount of narcotics in their

14  house and not really know anything about it or have any

15  understanding that it is there or whatever.  But as a matter

16  of fact, we have direct evidence at least to tie the other

17  defendant with it, Mr. Dwight Hassad Rashad, that the attache

18  or briefcase or whatever he had and through on the table,

19  on the dining room table, whatever it was, were keys that

20  unlocked the bottom of that basement room or window or

21  whatever it was where the narcotics were actually found.

22  That's why I was curious.

23            Was there any narcotics found anywhere

24  else in the house other than that place?  And the answer

25  was given in the negative.

1              However, simple as it may be, counsel,

2     I am going to dismiss the case against Ms. Bufkin.  I am

3     going to bind over Mr. Rashad.

4              As to Mr. Rashad, I find that the crime

5     of Possession With Intent to Deliver Cocaine was committed

6     in the City of Detorit and probable cause to believe that

7     he committed that crime.  He will be bound over to stand

8     trial in Recorder's Court.

9              As to the charge against Ms. Bufkin, the

10    matter is dismissed, there being no probable cause for

11    her arrest; and I cited the cases of Davenport and Summers

12    for the basis for doing it.

13              MR. HENRY:  Thank you, your Honor.

14              THE CLERK;  Arraignment date October 3rd,

15    9:00 o'clock.

16              MR. HEALY:  October 3rd?

17              THE CLERK:  Yes.

18              MR. HEALY:  Your Honor, in respect to

19    the bond there is a $500,000 ten percent bond on this matter.

20    We are dealing here with seven kilos of cocaine, and I

21    would suggest to you that the conditions have changed from

22    the time that the defendant Rashad came into court today.

23     He's now bound over for trial to a higher court and I

24    would suggest that a $500,000 ten persent bond is not

25    appropriate for this kind of case and that a $500,000 cash

1    bond would be appropriate.                    .

2                      THE COURT:  Did he make the bond?

3                      MR. HEALY:  He made the bond.

4                      THE COURT:  Do you want to be heard, Mr.

5    Henry?

6                      MR. HENRY:  Yes, your Honor.  Not only

7    did we have a full hearing on this matter and it was considered

8    by the judge of this court and the bond which he placed

9    on him is $175,000 and that was after review of all the

10   circumstances of the case involving not only consideration

11   of the search warrant and the other issues that are involved,

12   but also the fact the defendant has never failed to appear

13   and they took all of that into consideration; and it was

14   determined at the second hearing that was the appropriate

15   bond that should be set for him.

16                      For counsel to come in and yell he ought

17   to have a million dollar bond, we have been through that

18   before and it was denied by the Court.

19                      THE COURT:  He has never failed to appear

20   in court?

21                      MR. HENRY:  Never failed to appear in

22   any court.

23                      THE COURT:  Do we have any record of any

24   capiases at all at anytime?

25                      MR. HEALY:  I don't have any capiases.

53

1    I am not sure I have a very complete record either.   If

2    you wait just a second.

3                        MR. HENRY:   The Bail Information Bureau

4    went through it and made a report on him.

5                        MR. HEALY:   There are no capiases that

6    appear.

7                        THE COURT:   He's in court, that's what

8    he is required to do.   I will keep the bond the way it

9    is.

10                       MR. HENRY:   Thank you, your Honor.

11                       THE COURT OFFICER:   Court stands adjourned.

12   Please clear the courtroom.

13                       (The preliminary examination in the

14                       above-entitled cause was concluded at

15                       5:02 o'clock p.m.)

16                             --      --     --

17

18

19

20

21

22

23

24

25

                                                              54

```
 1  STATE OF MICHIGAN)
                     )  SS
 2  COUNTY OF WAYNE  )

 3

 4

 5              I, WILLIE S. COCKRELL, JR., Official Court

 6  Reporter of the 36th District Court for the City of Detroit,

 7  State of Michigan, do hereby certify that the foregoing pages,

 8  1 through 55, inclusive, is comprised of a full, true and

 9  correct transcript of the proceedings and testimony taken in

10  the matter of the People of the State of Michigan versus Dwight

11  Hassad Rashad and Sheila Bufkin, Recorder's Court No.  88-11275,

12  at a preliminary examination on September 19, 1988, before the

13  Honorable Rufus Griffin, Jr.
```

Willie S. Cockrell, Jr.

Mechanically reproduced copies of this transcript are not certified unless the certificate page bears an original signature.

DATED: October 14, 1988

55